IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KENNETH MCELROY,<br>DEBORAH MCELROY,<br><br>Plaintiff,<br><br>v.<br><br>THE W.W. WILLIAMS, COMPANY, INC.,<br>& W.W. WILLIAMS SOUTHEAST, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 2:16-CV-275-WHA<br>(WO) |

**MEMORANDUM OPINION AND ORDER**

## I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment, (Doc. # 28), and accompanying brief in support, (Doc. # 29), filed by Defendants The W.W. Williams Company, Inc. and W.W. Williams Southeast, Inc. (collectively, the "Williams").

The Plaintiffs, Kenneth McElroy and Deborah McElroy (collectively, the "Plaintiffs") filed a Complaint in this case on March 28, 2016.[1] In their Complaint, Plaintiffs seek compensatory and punitive damages for injuries allegedly suffered as a result of the Williams' failure to warn Plaintiff Kenneth McElroy ("McElroy") about the increased weight of three steel grate coverings that had been welded together and placed over a "sludge pit" that McElroy was required to lift as part of his job. (Doc. # 14).

On January 13, 2017, the Williams moved for summary judgment, arguing, principally, that they did not owe a duty to warn McElroy about the increased weight of the grates. (Doc. # 28). For reasons to be discussed, the Motion for Summary Judgment is due to be DENIED.

---

[1] Plaintiffs subsequently filed an Amended Complaint on September 9, 2016. (Doc. # 14). Any reference to the Plaintiffs' Complaint herein refers to the Amended Complaint.

## II. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be" and the party asserting that a fact "is genuinely disputed" must support their assertions by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include: "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court

shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. FACTS

The submissions of the parties establish the following facts, construed in the light most favorable to the Plaintiffs:

McElroy began working for Universal Environmental Services ("Universal") in November of 2011. (Doc. # 30-1, Exh. A, pp. 61:12–62:1).[2] His job at Universal was to drive a large vacuum truck, similar to those used to clean out septic tanks, and clean up oil spills and containment areas at commercial job sites. (Doc. # 30-1, Exh. A, pp. 40:21–43:11). One of his assignments was to clean out a "sludge pit" at the Williams' Facility. (Doc. # 30-1, Exh. A, pp. 48:22–49:2).

The Williams' Facility is a mechanics shop located in Montgomery, Alabama. (Doc. # 14, p. 2, ¶ 8). In addition to repairing vehicles, the Williams' Facility has a wash bay where Williams' employees wash vehicles. (Doc. # 30-2, Exh. D, pp. 10:13–10:18). The run-off from washing the vehicles funnels down into a pit, which is covered by five metal grates, the middle three weighing approximately fifty (50) pounds each. (Doc. # 30-1, Exh. A, pp. 49:14–51:5; 71:8–71:23). A water-oil separator then filters out the water from the oil and grease run-off, leaving behind a residue of sludge; hence the name, "sludge pit." (Doc. # 30-1, Exh. A, pp. 50:6–50:20).

During the course of his employment with Universal, McElroy had cleaned out the Williams' Facility's sludge pit at least four times, the last time being approximately a year before the accident. (Doc. # 30-1, Exh. A, pp. 52:3–53:6; 64:5–64:21; 65:4–65:7; 67:2–68:3). To clean out the sludge pit, McElroy would back up his truck to the pit, lift one of the middle three metal

[2] The court has referred to cited deposition testimony by the court's CM/ECF document number, but the internal page and line numbers from the depositions.

grates, insert a vacuum tube, and remove the sludge. (Doc. # 30-1, Exh. A, pp. 53:13–53:20; 83:10–85:21). McElroy performed all of these duties by himself and without the assistance of Williams' employees, because Universal had a policy that prohibited him from obtaining assistance. (Doc. # 30-1, Exh. A, pp. 68:4–69:22; 87:12–88:1). However, McElroy never had any difficulty lifting one of the metal grates by himself. (Doc. # 30-1, Exh. A, pp. 73:14–73:15; 77:6–77:15).

On October 7, 2014, McElroy, again, went to the Williams' Facility to clean out the sludge pit. (Doc. # 30-1, Exh. A, pp. 12:22–13:2). This was in response to an emergency call from Williams. (Doc. # 30-1, Exh. A, pp. 52:17–53:6). It had been nearly a year since his last visit, which was in October of 2013, because someone else from Universal had cleaned out the sludge pit in the interim. (Doc. # 30-1, Exh. A, pp. 67:21–68:3). He backed up his truck to the doors leading to the pit, went in the office to let them know he was there and what he was there to do. (Doc. # 30-1, Exh. A, pp. 13–20).

When McElroy attempted to lift one of the middle metal grates, as he had always done in the past, believing it weighed approximately fifty (50) pounds, at least one of the other metal grates came with it, making its actual weight much heavier. (Doc. # 30-1, Exh. A, pp. 73:2–75:5; 79:16–79:22).[3]

When Williams' employees lifted the grates for any reason they did it with a forklift and chains. In an attempt to make it easier to remove the grates and prevent someone from falling in when removing the grates with the forklift, Williams' employees had welded together the three middle metal grates.[4] (Doc. # 30-2, Exh. F, pp. 24:9–25:2).

[3] The parties are unclear about exactly how much the welded-together grates weighed.

[4] There is a dispute as to when the metal grates were welded together, as later discussed.

Although McElroy had cleaned out the sludge pit before the grates were welded together, Williams' employees did not inform McElroy that they had welded the grates together before he attempted to lift them or that they used a forklift and chains to lift them. (Doc. # 30-1, Exh. A, pp. 69:16–69:22). Moreover, Williams' employees had welded the grates together on the bottom side with angle irons. Therefore, the fact that they had been welded was not visible from the top and McElroy was not aware that the grates had been welded together when he attempted to lift them. (Doc. # 30-1, Exh. A, pp. 117:3–117:13).

As a result of unknowingly attempting to simultaneously lift more than one of the grates, McElroy suffered a severe back injury. (Doc. # 30-1, Exh. A, 73:13–73:21; 90:11–91:13). His injuries have allegedly resulted in the need for surgery, a permanent physical impairment, placement under lifting and other activity restrictions, loss of his job with Universal, limitations in employment opportunities, reduced wages, the need for future medical treatment, and pain and mental anguish. (Doc. # 14, p. 3–4, ¶ 16). Additionally, McElroy's injuries have allegedly negatively impacted his marriage and household. (Doc. # 14, p. 4, ¶ 17).

Accordingly, the Plaintiffs filed this suit against the Williams, asserting claims for negligence and wantonness (Count 1) and Loss of Consortium (Count 2). (Doc. # 14). After discovery, the Williams moved for summary judgment. (Doc. # 28).

## IV. DISCUSSION

The Williams move for summary judgment on McElroy's negligence and wantonness claims, arguing in addition to factual disputes, that they did not owe a duty to warn McElroy about the increased weight of the welded-together metal grates. (Doc. # 29). Specifically, the Williams contend that they did not owe a duty to warn McElroy, an independent contractor, of the danger of the increased weight of the welded-together metal grates when he was on their premises,

because he either (1) knew or (2) had reason to know that the grates were welded together and were heavy. *Id.*

Under Alabama law, "[a] premises owner's legal duty to a party injured by a condition of the premises depends upon the legal status of the injured party." *South Alabama Brick Co., Inc. v. Carwie*, __ So. 3d __, 2016 WL 1077265, at *5 (Ala. 2016). In this case, there is no dispute that McElroy was an independent contractor, because the Williams did not have the right to control the manner or method of his employment. *See Dickinson v. City of Huntsville*, 822 So. 2d 411, 416 (Ala. 2001). Accordingly, the Williams, as owners of the Williams' Facility, owed McElroy, as an independent contractor, only a duty to warn him of hidden defects and dangers that the Williams knew about, but were hidden or unknown to McElroy. *See Glenn v. U.S. Steel Corp., Inc.*, 423 So. 2d 152, 154 (Ala. 1982); *see also Chance v. Dallas Cnty., Ala.*, 456 So. 2d 295, 299 (Ala. 1984) (noting that an independent contractor is an invitee).

To prove liability for failure to warn, an injured independent contractor must show, at a minimum, that a duty to warn existed. *See Ex parte Meadowcraft Indus., Inc.*, 817 So. 2d 702, 706 (Ala. 2001). "A party claiming that a duty to warn existed must show: (1) that the defect or danger was hidden; (2) that it was known to the owner; and (3) that it was neither known to the contractor, nor such as he ought to know." *Roberts v. NASCO Equip. Co., Inc.*, 986 So. 2d 379, 384 (Ala. 2007) (internal citations and quotations omitted); *see also Jones Food Co., Inc. v. Shipman*, 981 So. 2d 355, 363 (Ala. 2006) (noting that liability rests upon the premises owner's "superior knowledge of the danger" which causes the independent contractor's injuries).

On the other hand, a premises owner does not owe a duty to warn an independent contractor about open and obvious defects or dangers. *See General Motors Corp. v. Hill*, 752 So. 2d 1186, 1187 (Ala. 1999). To prove that a defect or danger was open and obvious, a premises

owner must show either that it was not hidden or that it was a defect or danger about which the independent contractor knew, or ought to have known. *See Roberts*, 986 So. 2d at 384 ("The claim that a dangerous condition is open and obvious is an assertion that the first and third requirements of a duty-to-warn claim . . . cannot be satisfied because the danger was readily apparent.") This is because, where a defect or danger is open and obvious, the premises owner's knowledge of the danger cannot be said to have been superior to that of the independent contractor's knowledge. *See Jones Food Co.*, 981 So. 2d at 363.

In this case, the Williams only dispute whether McElroy knew or should have known that the grates were welded together. (Doc. # 29, p. 15). The Williams contend that the grates had been welded together "sometime between April and June of 2012." (Doc. # 29, p. 10). The Williams cite McElroy's deposition, in which he admits to having cleaned out the sludge pit at least four times prior to the incident giving rise to his claims, including once in October of 2013. (Doc. # 30-1, Exh. A, pp. 67:2–68:3). Therefore, the Williams argue that McElroy must have known that the grates were welded together before he attempted to lift them in October of 2014, because he had lifted the welded-together grates at least once before, when he cleaned out the Williams Facility's sludge pit in October of 2013.

McElroy responds with affirmative evidence that he did not know that the grates had been welded together on the date of his injury. McElroy testified in his deposition that when he went to clean out the sludge pit on October 7, 2014, he was not aware that the grates had been welded together, (Doc. # 30-1, Exh. A, pp. 111:14–112:13; 117:21–118:10; 119:7–119:19), and no one at the Williams' Facility warned him that the grates were welded together. (Doc. # 30-1, Exh. A, pp. 69:16–69:22).

McElroy also argues that the Williams' argument that McElroy knew or should have

known that the grates were welded together on the date of his injury is based upon speculation. The Plaintiffs submit:

> Defendants' argument that [McElroy] "knew" is based upon two facts (1) there is a Sabel Steel invoice for the purchase of some angle iron in April, 2012; and (2) angle iron is the material used to join the grates together. From those two facts, Defendants then stack inference upon assumption upon speculation upon conjecture to conclude that (1) the Sabel angle iron must have been used for the grates and not some other project; (2) the welding must have been completed immediately after the purchase of the angle iron in April, 2012; (3) *if* the welding occurred in April, 2012, then Ken must have experienced the welded-together grates one or more times before his injury in October, 2014; and (4) *if* Ken had experienced the welded-together grates before October, 2014, then he knew about them and was not entitled to a warning.

(Doc. # 32, p. 14). The Plaintiffs conclude, then, that summary judgment on whether McElroy should have known that the grates were welded together depends upon whether the Williams have proven that the grates were welded together before McElroy cleaned out the Williams' Facility's sludge pit in October of 2013. (Doc. # 32, pp. 14–15). If the grates had been welded together in October of 2013, McElroy would have been on notice—and should have known—that the grates were welded together on the date of his injury in October of 2014. *Id.*

The court agrees, and finds that, because there is a genuine dispute of fact concerning when the grates were welded together, summary judgment is inappropriate at this stage. The Williams argue in their brief that a receipt showing the purchase of a set of angle irons from Sabel Steel in April of 2012, (Doc. # 30-2, Exh. F, Defs. Exh. 1), and testimony from one of the Williams' employees, Steve Mason, that the angle irons would have been used to weld the metal grates together within a few days of their purchase, (Doc. # 30-2, Exh. F, pp. 32:4–39:19), shows that the grates were welded together sometime in the summer of 2012. But, McElroy testified in his deposition that the metal grates were not welded together when he came to clean out the Williams

Facility's sludge pit in October of 2013. (Doc. # 30-1, Exh. A, pp. 111:14–112:13; 117:21–118:10; 119:7–119:19).

Moreover, the Williams have not put forward dispositive proof that the grates were welded together before October of 2013. While the Williams' argument that a receipt showing the purchase of a set of angle irons in April of 2012, (Doc. # 30-2, Exh. F, Defs. Exh. 1), and testimony from one of the Williams' employees that the angle irons would have been installed within days of their purchase, (Doc. # 30-2, Exh. F., pp. 32:4–39:19), may allow a jury to draw the conclusion that the grates were welded together sometime in the summer of 2012, as mentioned previously, at the summary judgment stage, in light of the Williams' testimony that the grates were not welded together, and accepting the evidence of the nonmovant, drawing all justifiable inferences in his favor, the court must conclude there is a question of fact as to whether the grates were welded together before October of 2013. *See Anderson*, 477 U.S. 242, 255 (1986).

From the evidence before the court at this stage, drawing all inferences in favor of the Plaintiffs, a reasonable jury could conclude that the Williams welded the grates together after the last time McElroy serviced the sludge pit, that the fact of their being welded was not open and obvious, that their own employees used a forklift and chains to lift the grates after the welding because of the added weight, and that they did not advise McElroy of the welding or that they used a forklift and chains to do the lifting when he answered an emergency call to their premises, all leading to the legal conclusion that the Defendants had a duty to warn McElroy of the hidden danger. This may, of course, change based on the evidence actually presented at trial, with the issue being submitted on a motion for judgment as a matter of law.

Accordingly, the Williams' Motion for Summary Judgment on the negligence and wantonness claims and on the derivative loss of consortium claim is due to be DENIED.

## V. CONCLUSION

For the reasons discussed, it is hereby ORDERED that the Williams' Motion for Summary Judgment (Doc. # 28) is DENIED.

Done this 8th day of March, 2017.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE